[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Veolia Water N. Am. Operating Servs., Inc. v. Testa,* Slip Opinion No. 2016-Ohio-756.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-756

VEOLIA WATER NORTH AMERICAN OPERATING SERVICES, INC., APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Veolia Water N. Am. Operating Servs., Inc. v. Testa,* Slip Opinion No. 2016-Ohio-756.]

*Taxation—R.C. 5709.20 and 5709.21—Exemptions—Water-pollution-control facilities.*

(No. 2014-0170—Submitted November 17, 2015—Decided March 2, 2016.)

APPEAL from the Board of Tax Appeals, No. 2008-987.

_____

**Per Curiam.**

{¶ 1} This is an appeal from a decision of the Board of Tax Appeals ("BTA"), which affirmed the tax commissioner's disposition of an application for an exempt-facility certificate filed by appellant, Veolia Water North American Operating Services, Inc.  Veolia is the private owner and operator of a waste-water-treatment plant located in Franklin, Ohio, that serves the communities of

Franklin, Germantown, and Carlile. The facility also treats waste water emanating from paper- and cardboard-making operations of the Franklin Boxboard, Cheney Pulp and Paper, and Atlas businesses.

{¶ 2} Formerly known as the Franklin Regional Wastewater Treatment Facility and owned by the Water Conservation Subdistrict of the Miami Conservancy District, the plant was sold to Wheelabrator EOS of Ohio, Inc. During the period of its public ownership, the plant enjoyed complete exemption. That status came into question with private ownership and operation.

{¶ 3} The basis for Veolia's exemption claim is the treatment of the industrial waste water generated by its manufacturing customers. Veolia sought exemption of the real-estate improvements and *all* the personal property at the plant. The tax commissioner granted the exempt-facility certificate for only a percentage of the personal property the commissioner deemed to be exempt. The percentage reflected the amount of inflow that is industrial waste water but did not include the amount of residential waste water generated by the communities. The BTA affirmed the tax commissioner's disposition.

{¶ 4} Veolia has appealed. Veolia contended below that it was entitled to exemption of all the personal property or, at a minimum, that the percentage exempted should correspond not to the percentage of inflow from industrial operations but rather to the percentage of pollutants in the industrial waste water. On appeal, Veolia argues only that the entire facility is exempt; it does not address a partial tax reduction. The appeal also claims that the tax commissioner violated its duty to give some of Veolia's supplemental documentation to the Ohio Environmental Protection Agency ("EPA").

{¶ 5} Because we hold that the BTA's decision is both reasonable and lawful, we affirm.

### THE "EXEMPT FACILITIES" PROVISIONS

**{¶ 6}** In 1965, the General Assembly passed legislation "to encourage the installation of industrial water pollution control facilities * * * by providing tax exemption for such facilities." Title, Am.H.B. No. 1, 131 Ohio Laws, Part II, 1635. The law provided for the issuance of certificates by the newly created water-pollution-control board in the state health department. Former R.C. 6111.02, *id.* at Part I, 1418-1419. Later, the administrative duties were transferred to the Ohio EPA after the creation of that agency. Former R.C. 6111.31, Am.Sub.S.B. No. 397, 134 Ohio Laws, Part I, 695, 772-773. In 2003, the provisions governing industrial-water-pollution-control facilities were consolidated with other exempt-facility provisions and placed under the administrative aegis of the tax department. R.C. 5709.20 and 5709.21.

**{¶ 7}** The current list of exempt facilities includes air-pollution-control facilities, energy-conversion facilities, noise-pollution-control facilities, solid-waste-energy-conversion facilities, thermal-efficiency-improvement facilities, and industrial-water-pollution-control facilities. R.C. 5709.20. Application for a certificate is made to the tax commissioner. R.C. 5709.21(B). Upon obtaining a certificate from the tax commissioner, the holder enjoys exemption of the property described in the certificate from real and personal-property taxation. R.C. 5709.25(B). Additionally, the transfer of tangible personal property when the personal property is incorporated into property certified as an exempt facility is not a sale, and the transaction is exempt from sales and use taxation. R.C. 5709.25(A).

### FACTUAL BACKGROUND

*The property at issue*

**{¶ 8}** On March 16, 2005, Veolia filed an "Application for Air, Noise or Water Exempt Facility," with "water" marked as the focus of the application. Exemption was sought for the real-property improvements as well as personal

property; a list was attached to the application. The list is also set forth in the tax commissioner's final determination, where the property is divided into that which is found to be partially exempt and that which is fully taxable.

*The treatment of waste water*

{¶ 9} At the BTA hearing, Veolia's witness, Joe Hart, the former plant manager, distinguished the two sources of waste water treated by the plant. First, there was residential waste water, which is essentially sewage from households in the three cities using the plant. He indicated that treating this waste water was relatively easy: "[Y]ou come in, put some air to it, get the bacteria going and send it on its merry way." Second, there was industrial waste water, referred to as "Captain Nasty" because it carried a heavy stench and looked "like real thick gritty chocolate pudding."

{¶ 10} Veolia contends that the pollutants in the industrial waste water constituted 94 percent of the pollutants treated at the facility. On that basis, Veolia argues that the primary purpose of the plant is to treat the industrial waste water; according to Veolia, that reasoning justifies a 100 percent exemption for all the property at issue.

*Application and the EPA's opinion*

{¶ 11} After Veolia filed its application for exemption, the tax commissioner referred it to the Ohio EPA for an opinion, as required by R.C. 5709.211. The EPA's opinion divided the property listed in the application into "recommended property" and "non-recommended property." The EPA stated that the non-recommended property was not primarily used as an exempt facility. The EPA proposed approval of 17 percent of the recommended property, based on "factoring out residential and commercial waste"; the EPA based the percentage on information supplied by Veolia.

*Proceedings before the tax commissioner*

**{¶ 12}** The tax commissioner issued a proposed finding based upon the EPA recommendation on August 17, 2006, and Veolia sought reconsideration and a hearing. Veolia did not request that the EPA attend the hearing.

**{¶ 13}** A hearing was held at the tax department on August 7, 2007. Veolia submitted documentation before and after the hearing.

**{¶ 14}** On April 29, 2008, the tax commissioner issued his final determination. Relying on the EPA's recommendation and Veolia's admission that "only 17 percent of the waste coming into its facility is industrial waste," the commissioner granted a 17 percent exemption. The determination notes that during and after the hearing, Veolia "insisted that the percentage of industrial pollutants accounted for more than 94 percent of the pollutants it treats at its facility," but before the hearing it had presented evidence that 57 percent of the pollutants it treated were industrial pollutants. The tax commissioner viewed that as a "sharp increase" that indicated that "the applicant's facts and figures may be unreliable." The tax commissioner included as exempt several items of personal property that were previously excluded, subject to the 17 percent exemption, but continued to refuse exemption for other items of personal property.

*Proceedings before the BTA*

**{¶ 15}** Veolia appealed to the BTA on July 7, 2008. The BTA held a hearing on November 2, 2010, at which Veolia presented the testimony of Hart, the former plant manager, and the tax commissioner presented the testimony of Dan Kopec, an EPA engineer. The testimony clarified that the 17 percent figure relied on by the EPA and the tax commissioner corresponded to the percentage of the total flow of waste water that was "industrial flow." In contravention, Veolia contended that the percentage of the exemption should correspond to the percentage of contaminants in the industrial inflow, which was higher.

{¶ 16} The BTA issued its decision on December 31, 2013. BTA No. 2008-987, 2013 Ohio Tax LEXIS 7596 (Dec. 31, 2013). The BTA found "no error in the commissioner's use of the amount of waste, rather than the amount of contaminants therein, in determining whether the facility's 'primary purpose' is to treat industrial waste." *Id.*, 8. The BTA found that the "use of flow as a measurement, rather than the concentration of pollutants, [was] a more practical measure in light of the evidence presented." *Id.*, 9-10. In support of its decision, the BTA emphasized Joe Hart's acknowledgment that the concentration of pollutants "varies day by day and at different points in a single day," as well as Kopec's testimony that the concentration of pollutants could not be determined without additional information that Veolia had not provided. *Id.*

{¶ 17} The BTA also affirmed the determination that certain property was not entitled to the partial exemption. *Id.*, 11. With respect to the contention that the tax commissioner had failed to submit certain evidence to the EPA, the BTA noted that the tax commissioner had abided by the statutory requirements, that the information in question was not submitted in the original application, and that Veolia had not requested that the EPA participate in the hearing before the tax department.

{¶ 18} The BTA affirmed the tax commissioner's determination, and Veolia has appealed.

### VEOLIA'S PROPOSITIONS OF LAW

1. The statutory requirement of "primary purpose" is determined by the property's function, rather than other arbitrary and easily-identifiable traits.

2. The Tax Commissioner must consult with the Environmental Protection Agency to consider data presented by the taxpayer which describes the pollution control activities.

**STATUTORY BASIS FOR THE VEOLIA PLANT TO QUALIFY AS AN INDUSTRIAL-WATER-POLLUTION-CONTROL FACILITY**

*The test for exempt-facility status for industrial-water-pollution control*

{¶ 19} The exempt-facility provisions at R.C. 5709.20 et seq. constitute tax-reduction provisions that call for the applicant to meet a stringent burden of proof: Veolia must show that the statutes " 'clearly express[ ] the exemption' in relation to the facts of the claim." *Anderson/Maltbie Partnership v. Levin*, 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16, quoting *Ares, Inc. v. Limbach*, 51 Ohio St.3d 102, 104, 554 N.E.2d 1310 (1990); *accord Timken Co. v. Lindley*, 64 Ohio St.2d 224, 227, 416 N.E.2d 592 (1980) (in evaluating a claim for an analogous air-pollution-control certificate, "laws relating to exemption from taxation" must be "construed most strongly against the exemption"); *Newman v. Levin,* 120 Ohio St.3d 127, 2008-Ohio-5202, 896 N.E.2d 995, ¶ 30 (applying strict-construction principle to an electric-generating station's application to exempt a thermal-efficiency-improvement facility).

{¶ 20} Thus, Veolia had the burden to show that its property qualifies as an industrial-water-pollution-control facility. There are several elements to making such a showing:

- The effluent treated must satisfy the definition of "industrial waste," which is "any liquid, gaseous, or solid waste substance resulting from any process of industry, manufacture, trade, or business, or from the development, processing, or recovery of any natural resource, together with such sewage as is present." R.C. 6111.01(C).

- The property must be "designed, constructed, or installed for the primary purpose of collecting or conducting industrial waste to a point of disposal or treatment" or "reducing, controlling, or eliminating water pollution caused by industrial waste; or reducing, controlling, or

eliminating the discharge into a disposal system of industrial waste or what would be industrial waste if discharged into the waters of this state." R.C. 5709.20(L).

- The law distinguishes between "exclusive property" and "auxiliary property." R.C. 5709.21. The latter category is property "installed, used, and necessary for the operation of an exempt facility that is *also used in other operations of the business other than an exempt facility purpose*," while the former is property installed to operate an exempt facility "that is not auxiliary property." Auxiliary property will enjoy a partial certification and exemption, while exclusive property will be fully certified and exempted. *See* R.C. 5709.21(C)(2). When property is used exempt "for discrete periods of time," exemption is determined based on the percentage of time that it is used for the exempt purpose. R.C. 5709.21(A)(3)(a). If the property is used concurrently for an exempt and a nonexempt purpose, R.C. 5709.21(A)(3)(b) applies, and the burden of proving the exempt share is on the applicant.

- The property must also have been both "placed into operation or initially capable of operation after December 31, 1965, and installed pursuant to the approval of the environmental protection agency or any other governmental agency having authority to approve the installation of industrial water pollution control facilities." *Id*.

{¶ 21} As for the fourth point, there is no dispute on either prong. The facility dates back to the early 1970s, and the record contains its 2003 approval by the EPA.

{¶ 22} The dispute in this appeal concerns the first three points: only some of the effluent treated is "industrial waste," the remainder being residential waste water, and the treatment of industrial and residential waste water means that the property is not used only for the treatment of industrial waste water. As to the

8

distinction between "exclusive property" and "auxiliary property," Veolia argues that the tax commissioner's reliance on flow measurements as the basis for a percentage exemption is "without legal justification." But the distinction between exclusive and auxiliary property furnishes precisely the justification for a percentage approach, and it is telling that Veolia fails to address the auxiliary-property concept.

## THE TAX COMMISSIONER AND THE BTA PROPERLY APPLIED THE PRIMARY-PURPOSE TEST AND THE AUXILIARY-PROPERTY CONCEPT

### Veolia's claim for 100 percent exemption cannot be reconciled with R.C. 5709.21(B) and the case law

{¶ 23} Although it argued for a higher percentage of exemption below, on appeal Veolia stands by its "entire facility" claim: "Because the Treatment Facility's primary purpose is to treat industrial waste—and the industrial pollutants contained therein—the entire Treatment Facility is exempt from tax." This assertion is contradicted by both the statute and the case law. Indeed, Veolia's insistence that the BTA and the tax commissioner never defined "primary purpose," or that they defined it incorrectly, is beside the point; the central point is whether the primary-purpose test should be applied to the entire plant or to each article of property individually. Veolia argues for the global application of the test, which is mistaken for two reasons.

{¶ 24} First, Veolia's argument ignores the distinction in R.C. 5709.21 between "exclusive property" and "auxiliary property." The distinction requires the tax commissioner to look at the functionality of each article of property in relation to the control of pollution and break out the percentage of use that permits the exemption. Thus, the global approach advocated by Veolia is precluded.

{¶ 25} Additionally, R.C. 5709.20(M) states that property that serves the business's own benefit, rather than the control of pollution, is not an exempt facility, thereby underscoring the need to look at property piece by piece.

**{¶ 26}** Second, Veolia's argument runs afoul of the case law, which reinforces that the functionality criterion must be *applied to each article of property individually*. In *Transue & Williams, Div. of Std. Alliance Industries, Inc. v. Lindley*, 54 Ohio St.2d 351, 376 N.E.2d 1341 (1978), the taxpayer's forging plant, which had been cited for violating Ohio air-pollution-control regulations, implemented a pollution-control strategy. The tax commissioner, the BTA, and ultimately this court rejected the taxpayer's contention that "but for the necessity that it bring itself into compliance with EPA standards, it would have made none of the expenditures for capital improvements being taxed and, therefore, all such new facilities were 'designed primarily for the control of air pollution.' " *Id*. at 352-353. The certification was limited to the portions of the articles of property that were "used exclusively for air * * * pollution control," pursuant to former R.C. 5709.21, Am.H.B. No. 1, 135 Ohio Laws, 1067, 1107. *Id*. at 353. *Accord Timken*, 64 Ohio St.2d 224, 416 N.E.2d 592; *Sun Oil Co. v. Lindley*, 56 Ohio St.2d 313, 383 N.E.2d 908 (1978).

**{¶ 27}** Although the present case differs from most others because it involves a privately owned plant that was previously publicly owned, that fact does not establish entitlement to a full exemption of the plant. More familiar in the case law are those cases in which an industrial facility seeks to exempt some portion that is devoted to pollution control. Here, the entire plant's purpose is indeed pollution control. And Veolia relies on this unusual circumstance—that the entire plant is pollution control—to seek exemption of *all the property* associated *with the operation of the plant*, to the extent that the "primary purpose" of the plant is industrial-waste-water treatment.

**{¶ 28}** But Veolia's argument is mistaken under the case law; even if the plant treated *only* industrial waste water, trucks and general buildings would not be exempted under the primary-purpose test. Certain trucks, for example, would not have been acquired and used by the taxpayer but for the fact that industrial

10

waste water is treated at the site; on this basis, Veolia contends that, for that reason, these trucks are entitled to exemption. As just discussed, however, the case law rejects a "but-for" test in favor of construing the pollution-control statutes to impose a direct functionality test.

{¶ 29} Under the latter test, the trucks were not themselves designed, constructed, or installed for the primary purpose of either "collecting or conducting industrial waste to a point of disposal or treatment," or of "reducing, controlling, or eliminating water pollution caused by industrial waste." As a result, the tax commissioner was justified in "disregard[ing] the taxpayer's purpose" in acquiring and using the trucks. *Timken*, paragraph two of the syllabus.

*Veolia's argument concerning the primacy of the treatment of industrial over residential waste water is historically and quantitatively untenable*

{¶ 30} In arguing that the treatment of industrial waste had absolute primacy, Veolia points to Hart's testimony that the facility was constructed and designed to treat industrial waste water. Although Hart's statement that the industrial customers are the major contributors was not contradicted by another witness, that assertion does not establish that the principal purpose of building the plant was to serve those customers. Indeed, that assertion cannot be seen as credible in light of the development of the plant in the 1970s to serve the three communities as well as to process industrial effluent. Moreover, the evidence that industrial inflow was limited to about 17 percent refutes the assertion from a quantitative standpoint as well.

*Veolia's reliance on the diluting properties of residential waste water is misplaced*

{¶ 31} Veolia also invokes the phrase "Dilution is critical in the solution to industrial pollution" in support of its position: according to Hart's testimony, the less polluted residential waste water actually helps clean the more heavily

11

polluted industrial waste water. As a result, Veolia argues that the residential waste water treats the industrial pollution.

{¶ 32} But the fact that the residential waste water helps dilute the industrial waste water does not establish that dilution is the *reason for the presence of the former* at the plant. To the contrary, the residential waste water is also in need of treatment, and is treated, by the plant. The plant exists for the purpose of treating *both* kinds of inflow, not just one or the other.

## NO LEGAL ERROR HAS BEEN SHOWN WITH RESPECT TO THE CONSIDERATION OF THE EVIDENCE BY THE EPA

{¶ 33} Under its second proposition of law, Veolia contends that the tax commissioner had a duty to transmit the documentation it submitted during the hearing process before the tax department to the EPA for evaluation. But our review of the record in light of the statutes leads us to reject this contention on two grounds. First, we do not see any provision that requires the tax commissioner to submit supplemental evidence to the EPA, yet here the documentation at issue was submitted *after* the initial application and the EPA's review of it. Second, Veolia failed to exercise its statutory right under R.C. 5709.22(B) to demand that the EPA participate at the hearing before the tax department, a demand that would have inevitably exposed the EPA to the new documentation.

{¶ 34} It is also worth noting that the testimony of the EPA engineer at the BTA hearing indicated that the EPA's recommendation would not have changed based on the newly submitted documentation, because using pollutant concentration to determine the percentage of the exemption has not been deemed an acceptable approach by the EPA.

### CONCLUSION

{¶ 35} For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Bailey Cavilieri, L.L.C., and Harlan S. Louis, for appellant.

Michael DeWine, Attorney General, and Sophia Hussain, Assistant Attorney General, for appellee.

_____